Michele Molinario, Bar #020594
Derek R. Graffious, Bar #033486
Ashley E. Caballero-Daltrey, Bar #036449
Melynda M. Meyrick, Bar #039695
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1746
Fax: (602) 200-7831
mmolinario@jshfirm.com
dgraffious@jshfirm.com
adaltrey@jshfirm.com
mmeyrick@jshfirm.com

Attorneys for Defendants City of Yuma
and James Baisch

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Lucas Mullikin,

Plaintiff,

v.

City of Yuma; James Baisch, in his personal capacity,

Defendants.

No. 2:25-cv-00637-ROS-JZB

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This is a case arising from Plaintiff's arrest after he repeatedly refused lawful commands to back up and move away from an active scene unfolding on a public sidewalk adjacent to a major thoroughfare. Yuma Police Department ("YPD") Officers struggled to gain control of a resisting male subject suspected of trespassing. Because Plaintiff refused to maintain a reasonable distance, Officer Baisch escorted Plaintiff back several feet to create distance between Plaintiff and the active scene. But Plaintiff physically resisted Officer Baisch's effort to move him back by pushing against him, grabbing onto a fence and using his body weight to impede Officer Baisch's low level use of force to place him on the ground. Once placed on the ground and told to "stay" there, Plaintiff again defied a lawful order, which interfered with Officer Baisch's ability to assist three YPD Officers struggling to safely detain the resisting suspect, and created an unsafe situation. Plaintiff stood up and headed straight toward Officer Baisch from behind, which led to Plaintiff's arrest. Plaintiff brought several claims arising from his arrest against the City of Yuma and Officer Baisch, including false arrest, arrest in retaliation of his First Amendment rights, excessive force, and a *Monell* claim.

Defendants move for summary judgment on all Plaintiff's claims. Officer Baisch had probable cause to arrest Plaintiff, and the record lacks any evidence that he did so in retaliation of Plaintiff's First Amendment rights. In fact, Plaintiff's girlfriend also filmed that night and was not arrested or cited because she complied with the officers' commands to move away from the active scene. Additionally, given Plaintiff's failure to heed commands, Officer Baisch utilized reasonable (and minimal) force under the totality of the circumstances. Moreover, Officer Baisch is entitled to qualified immunity because no case clearly established the rights at issue here. Finally, Plaintiff's *Monell* claim fails because the City did not have an unconstitutional policy or practice. This Motion is supported by the accompanying statements of fact ("DSOF") and attachments thereto, which are incorporated by reference.

## I. FACTS

### A. Initial Response.

On May 16, 2023, Yuma Police Department ("YPD") received a report of a suspected trespasser. [DSOF ¶ 1.] Initially, YPD Officer Ryan Kinnell was the sole officer who

responded to the call and attempted to approach the suspect who was on a public sidewalk of a busy street. [DSOF ¶ 2.] The suspect physically hindered every attempt Officer Kinnell made to detain him, including using his body weight against Officer Kinnell, throwing himself on the ground, and grabbing onto a wrought iron fence. [DSOF ¶ 3.] The victim of the trespass was also present, standing off to the side. [DSOF ¶ 4.] The incident occurred on a major roadway in Yuma. [DSOF ¶ 5.]

Plaintiff Lucas Mullikin and his girlfriend, non-party Alissa Heap, were staying in Yuma that night and drove by as Officer Kinnell was attempting to stop the suspect on foot. [DSOF ¶ 6.] Plaintiff testified that he saw a larger individual wrestling with a smaller individual and decided to stop. [DSOF ¶ 7.]

Plaintiff and Heap both began recording the incident and approached Officer Kinnell, who was still the sole officer on scene and struggling to apprehend the suspect. [DSOF ¶ 8.] Plaintiff immediately interjected himself into the scene and began peppering Officer Kinnell with numerous questions, e.g., why he was arresting the suspect and what his badge number was, all while Officer Kinnell was still struggling with the suspect. [DSOF ¶ 9.] Through the interaction, Officer Kinnell nevertheless responded to his questions, even while he was trying to effectuate the detention of the actively resisting suspect. [DSOF ¶ 10.] During the active struggle between Officer Kinnell and the suspect, Plaintiff and Heap moved close to Officer Kinnell, who had to divert his attention to them and told them both to back up multiple times. [DSOF ¶ 11.] During the interaction, Heap backed up as she was directed. [DSOF ¶ 12.] Instead of backing up, Plaintiff stated multiple times that he was six feet away, indicating that he did not believe he needed to move. [DSOF ¶ 13.] He refused to comply, backing up only tiny steps despite Officer Kinnell's repeated commands. [DSOF ¶ 14.]

Plaintiff moved closer to Officer Kinnell and continued to demand that he answer his questions, arguing with him about the law and the nature of the arrest. [DSOF ¶ 15.] At the same time, Officer Kinnell attempted to get the suspect to his feet, while the suspect used his body weight against him, nearly pulling them both into the street. [DSOF ¶ 16.] During the struggle, Plaintiff was so close that Officer Kinnell could have leaned forward and touched

him. [DSOF ¶ 17.]

Plaintiff identified himself as a journalist. [DSOF ¶ 18.] Officer Kinnell had to go hands off with the suspect to deal with Plaintiff, and then he had to regain his hold on the suspect to pull him back off the ground. [DSOF ¶ 19.] After a renewed struggle, including the suspect attempting to hook his leg around the wrought iron fence, Officer Kinnell was able to escort the suspect as far as the corner of the fence line. [DSOF ¶ 20.] Officer Kinnell called for backup during this struggle and Plaintiff continued to ask him questions. [DSOF ¶ 21.]

**B. <u>Officer Baisch Arrives On Scene.</u>**

Officer Kinnell's original call for backup indicated that it was urgent and that he was surrounded by people. [DSOF ¶ 22.] Officer Baisch, who was with an officer in field training, responded. [DSOF ¶ 23.] Before Officer Baisch arrived, Officer Kinnell radioed that things were "Code 4" indicating that he had the situation under control. [DSOF ¶ 24.] Officer Baisch stopped responding. [DSOF ¶ 25.] However, a passerby then noticed the predicament that Officer Kinnell was facing and called 911 to report an officer was surrounded. [DSOF ¶ 26.] Learning this, Officer Baisch and the trainee resumed their response to Officer Kinnell's location, with lights and sirens. [DSOF ¶ 27.] Multiple officers arrived on scene for backup. [DSOF ¶ 28.]

When Officer Baisch arrived on scene, he observed three officers huddled around the suspect, who was on the ground and appeared to have wrapped himself around the iron fence to resist officer efforts to detain him. [DSOF ¶ 29.] He noticed that Officer Kinnell and another officer were standing behind the suspect and a third officer was on the ground on the suspect's right, attempting to unhook the suspect's legs from around the fence. [DSOF ¶ 30.] He intended to assist these officers by approaching the left side of Officer Kinnell and getting on the ground to work on unlatching the suspect's legs. [DSOF ¶ 31.] As Officer Baisch got near, he observed Plaintiff standing very close to Officer Kinnell and the suspect, who was still not apprehended and fighting the officers' efforts to take him in. [DSOF ¶ 32.] To assist with detaining the suspect, Officer Baisch would also have to kneel on the ground, which would place him a mere couple feet in front of where Plaintiff stood. [DSOF ¶ 33.] Officer

Baisch knew that kneeling a couple of feet in front of Plaintiff would put him within striking distance from Plaintiff and would place him in a tactical position of disadvantage. [DSOF ¶ 34.] Officer Baisch was concerned about everyone's safety, including Plaintiff's. [DSOF ¶ 35.] Accordingly, he twice ordered Plaintiff to get back. [DSOF ¶ 36.]

**C. <u>Backwards Escort and Placement On Ground.</u>**

Plaintiff refused to comply with Officer Baisch's commands. [DSOF ¶ 37.] Instead, he told Officer Baisch twice, "its six feet." [DSOF ¶ 38.] During this interaction, Heap is heard telling Plaintiff that it was not six feet so that he would back up, but he did not. [DSOF ¶ 39.] At this point, three officers were still unable to fully detain the resisting suspect, and Officer Baisch could not assist because Plaintiff refused to keep a reasonable distance from him. [DSOF ¶ 40.] Plaintiff refused to comply and Officer Baisch placed two hands on one of Plaintiff's arms and escorted Plaintiff back, which is the lowest level of force that an officer has besides his presence and verbal commands. [DSOF ¶ 41.] Plaintiff pushed against Officer Baisch, and after a few feet backward, grabbed onto the fence so that Officer Baisch could not move him back. [DSOF ¶ 42.] Officer Baisch struggled to break Plaintiff's hold of the fence and then put his hand on Plaintiff's head to lower him to the ground because Plaintiff had resisted and refused to comply with lawful commands and the escort backwards. [DSOF ¶ 43.] Plaintiff pushed against Officer Baisch with his chest and leaned on him during the interaction. [DSOF ¶ 44.] After Officer Baisch put Plaintiff on the ground, he told him to "stay" there. [DSOF ¶ 45.]

**D. <u>Arrest and Takedown.</u>**

Officer Baisch turned from Plaintiff and walked back to where the other YPD officers were still struggling with the suspect. [DSOF ¶ 46.] Plaintiff again disregarded Officer Baisch's command, stood up, and headed straight for Officer Baisch from behind. [DSOF ¶ 47.] Officer Baisch noticed from his peripheral that Plaintiff was approaching from behind him. [DSOF ¶ 48.] At that time, Officer Baisch decided to arrest Plaintiff because he had probable cause for failure to comply with lawful commands, and for assault for leaning and pushing on him during the escort backwards. [DSOF ¶ 49.] Simultaneously, Plaintiff asked for Officer

Baisch's name and badge number as he moved towards him. [DSOF ¶ 50.] Officer Baisch does not remember hearing the question. [DSOF ¶ 51.]

As Officer Baisch turned back toward Plaintiff, he told Plaintiff that he was under arrest for failure to comply. [DSOF ¶ 52.] Plaintiff refused to give up his arms, and he pulled away and physically resisted while Officer Baisch attempted to get him into handcuffs. [DSOF ¶ 53.] Instead, he kept physically resisting, and, in the ensuing struggle, Plaintiff ended up on the ground. [DSOF ¶ 54.] Plaintiff still attempted to get up multiple times after he was initially put on the ground. [DSOF ¶ 55.] Eventually, with the help of another officer, Officer Baisch was able to handcuff Plaintiff. [DSOF ¶ 56.] It is undisputed that Officer Baisch did not deliver a leg sweep, kick, open palm or closed fist strike to any part of Plaintiff's body, slam his head on the ground, or deploy chemical spray or any electronic device such as a Taser. [DSOF ¶ 57.] Officer Baisch put Plaintiff's phone safely on the ground when Plaintiff requested that he do so. [DSOF ¶ 58.] During the struggle, Officer Baisch was concerned that the incident could spill out onto the street and wanted to ensure that everyone was safe. [DSOF ¶ 59.]

Officer Baisch arrested Plaintiff for resisting arrest and refusing an officer command under Yuma City Code § 111-04. [DSOF ¶ 60.] YPD officers routinely arrest for violations of Yuma City Code § 111-04 and resisting arrest. [DSOF ¶ 61.]

Plaintiff testified that the only injuries he sustained from the incident were scrapes on his knees and forehead as a result of the scuffle. [DSOF ¶ 62.] He was not limping the night of the incident. [DSOF ¶ 63.] Plaintiff did not request medical attention at the scene. [DSOF ¶ 64.] He never sought medical attention of any kind for injuries arising from the arrest. [DSOF ¶ 65.] Plaintiff testified that the scrapes all occurred in the second half of the incident, when Officer Baisch attempted to place him in handcuffs and effectuate the arrest. [DSOF ¶ 66.] Plaintiff did not know any of the Officers prior to the date. [DSOF ¶ 67.]

Heap was not arrested. [DSOF ¶ 68.] She testified that she stayed far away from the officers so she would not obstruct the arrest. [DSOF ¶ 69.] Another witness was also present on the scene, and he was not arrested because he stayed away from officers like Heap. [DSOF ¶ 70.] Officer Baisch would not have ultimately arrested Plaintiff if not for the fact that Plaintiff

got back up off the ground after he was told to stay there and he began interfering again. [DSOF ¶ 71.] Officer Baisch was not aware that Plaintiff was a journalist, but that would not have changed anything about the incident, because Plaintiff had still committed a crime. [DSOF ¶ 72.] Officer Baisch had experience with citizens filming police prior to this incident and has never arrested anyone who was filming prior to Plaintiff. [DSOF ¶ 73.]

### E. <u>The City's Policies and Training.</u>

The City maintains policies and trains on use of force. [DSOF ¶ 74.] At the time of the incident, it also maintained a Media Relations Policy 1.12, which informed officers that members of the media are permitted to record officer's conduct. [DSOF ¶ 75.] It specifically created training for personnel who interact with the media and dictates that at crime scenes, news media representatives may be present and "agency personnel shall ensure that members of the media respect the established perimeter;" however, "[m]edia staff has no greater or lesser access to an incident scene than members of the general public." [DSOF ¶ 76.] Under the policy, an officer shall not prohibit the media from news gathering practices, including photography, outside of an established perimeter. [DSOF ¶ 77.]

The City also maintained a directive regarding filming and the First Amendment. [DSOF ¶ 78.] That directive had the same force as policy, and Officer Baisch, as well as all other YPD officers, was required to acknowledge it. [DSOF ¶ 79.] The directive comprehensively explains how an officer should approach a situation with an individual filming an incident, including considerations regarding approaching that person, and it explicitly tells officers that "[c]itizens have a right to utilize a camera or recording device to document the police encounter." [DSOF ¶ 80.] Officers are trained on the First Amendment through their AZPOST training and in City of Yuma trainings. [DSOF ¶ 81.] For example, they undergo legal training throughout the 20 weeks of the academy which builds their constitutional understanding and foundation. [DSOF ¶ 82.] Then, in field officer training, officers receive more education, including a minimum of 12 hours of additional training a year. [DSOF ¶ 83.] YPD offers approximately eight times more training than the 12-hour minimum. [DSOF ¶ 84.] Officer Baisch testified that they have "trainings and briefings where the

sergeants would advise [officers] on what [they're] expected to do when dealing with people filming." [DSOF ¶ 85.] Importantly, Plaintiff's expert conceded that Officer Baisch's training exceeded minimum standards, and that AZPOST training is "excellent." [DSOF ¶ 86.]

Officer Baisch never received any discipline on any relevant uses of force, nor had he ever been disciplined in a case involving a First Amendment activity. [DSOF ¶ 87.] Officer Baisch's actions in this case were found to be within policy. [DSOF ¶ 88.] After the incident, the YPD put out a video sharing the body-worn camera and Chief Garrity explained the incident to be transparent with the community. [DSOF ¶ 89.]

## II. PLAINTIFF'S FALSE ARREST CLAIMS[1] FAIL BECAUSE THE OFFICERS HAD PROBABLE CAUSE.

Officer Baisch had probable cause (and thus also reasonable suspicion) to seize Plaintiff beginning at the time that he first escorted Plaintiff backwards. An arrest is lawful if officers had probable cause to arrest for any offense, not just the stated reason for arrest. *District of Columbia v. Wesby*, 583 U.S. 48, 54 n.2 (2018). Probable cause exists where there is "a fair probability or substantial chance of criminal activity" and it "is not a high bar." *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1164 (9th Cir. 2022) (cleaned up); *see Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Under the collective knowledge doctrine, if one officer has probable cause to arrest a suspect, all officers have probable cause. *See United States v. Ramirez*, 473 F.3d 1026, 1032–33 (9th Cir. 2007).

Here, Officer Baisch had probable cause to believe that Plaintiff violated A.R.S. § 13-2413 (interfering with a crime scene investigation), A.R.S. § 13-2508 (resisting arrest), A.R.S. § 13-1203(A)(3) (assault), A.R.S. § 13-1204(A)(8)(a) (assault against a peace officer), and Yuma City Code § 111-04.[2] Plaintiff was interfering with an arrest by getting too close to arresting

---

[1] This Court should analyze claims five and six together. It appears that claim five is a claim that the officers did not have reasonable suspicion and claim six is a claim that the officers did not have probable cause. Plaintiff seems to make a distinction between various phases of the interaction, but that is a distinction without a difference.

[2] This section provides: "No person shall willfully fail or refuse to comply with any lawful order or direction of a police officer or Fire Department official."

officers and refused to obey commands when he was told to back up. Courts routinely find that officers have probable cause for arrest in those circumstances. *See Borquez v. City of Tucson*, 475 Fed. App'x 663, 665 (9th Cir. 2012) (affirming summary judgment on false arrest claim because officers had probable cause where plaintiff interfered with an arrest); *see also Gonzalez v. City of Newport Beach*, No. 820CV00142JLSADS, 2021 WL 6618757, at *6 (C.D. Cal. Oct. 13, 2021) (collecting cases and finding probable cause where plaintiffs refused to obey officer commands and interfered with a traffic stop); *Dominguez v. City of Scottsdale*, 587 F. Supp. 3d 914, 936 (D. Ariz. 2022), *aff'd in part, appeal dismissed in part on other grounds*, 2023 WL 3299985 (9th Cir. May 8, 2023) (finding probable cause for arrest under similar city ordinance).

Here, Plaintiff arrived on scene and began immediately asking Officer Kinnell questions while standing close, which interfered with Officer Kinnell's ability to arrest the suspect. Heap's video shows Plaintiff standing close enough to Officer Kinnell that if Officer Kinnell had leaned forward, he would have touched Plaintiff. This occurred while Officer Kinnell was actively attempting to get the trespassing suspect (who was belligerent and physically resisting him) under control, and he had no backup at that time. Plaintiff refused Officer Kinnell's orders and was actively impeding Officer Kinnell's ability to arrest the suspect, because he had to split his attention and deal with Plaintiff, his questions, and his unsafe proximity to the in-process arrest. He had radioed that he was surrounded, and a 911 caller had later called and confirmed the same thing. Officer Baisch was aware of those facts through the calls *and* the collective knowledge doctrine. Officer Baisch, therefore, had probable cause to arrest Plaintiff under the Yuma City Code and A.R.S. § 13-2413 from the second he arrived on scene.

Although Officer Baisch had probable cause to seize him right away, he did not. Instead, he asked Plaintiff to back away from the scene. When Officer Baisch arrived, Plaintiff was standing near where Officer Kinnell was struggling with the suspect, who had put his legs through a wrought iron fence. Officer Baisch could not assist with detaining the suspect, because the only spot where he could get on his knees and assist was too close to Plaintiff.

Plaintiff refused officer commands and instead stated that he was six feet away—a fact that is of *no* consequence under Arizona or federal law. Because he refused lawful commands, Officer Baisch escorted him backwards. After a couple of steps, Plaintiff held onto the fence, using the fence and his body weight to resist arrest, in a violation of A.R.S. § 13-2508. Plaintiff also refused Officer Baisch's command to stay on the ground and instead stood up and came toward Officer Baisch from behind, attempting to interfere with the ongoing arrest of the suspect. A.R.S. §§ 13-2413, 13-2508. Then, when Officer Baisch attempted to arrest him, he refused to give up his hands and it took both Officer Baisch and Sgt. Angulo to get him handcuffed. All that conduct is also a violation of Yuma City Code § 111-04. And Plaintiff's attempts to resist included pushing up against Officer Baisch, which is an assault under Arizona law. A.R.S. §§ 13-1203(A)(3), 13-1204(A)(8)(a).

Officer Baisch had probable cause for multiple offenses, and probable cause is an absolute defense to Plaintiff's false arrest/unreasonable seizure claims, no matter how stated. Summary judgment is proper on Claims 5 and 6.

## III. **<u>SUMMARY JUDGMENT IS PROPER ON PLAINTIFF'S FIRST AMENDMENT CLAIMS.</u>**[3]

To state a First Amendment retaliation claim against a government official, "a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). If officers arrest a plaintiff with probable

[3] The Court should analyze Counts One and Two together. Plaintiff does not have a separate claim for a violation of his First Amendment rights other than the retaliation claim. *See, e.g.*, *Chaffee v. Chiu*, No. 4:11–CV–05118–YGR, 2012 WL 4343824 at *5 (N.D. Cal. Sept. 20, 2012) (denying plaintiff's Motion for Leave to Amend his First Amendment interference claim because it was duplicative of his First Amendment violation claim which included the issue of retaliation). It is unclear what how Plaintiff believes his rights were interfered with *other* than through the allegedly retaliatory arrest. To the extent that he claims that Officer Baisch interfered with his rights by refusing to let him ask questions or film, [*see* Doc. 1 ¶¶ 87, 91,] the record clearly shows that he asked several questions and filmed until it was no longer safe to do so. Regardless, the analysis regarding the arrest is applicable starting at the point where Officer Baisch moved Plaintiff back, which is the basis of the majority of the allegations in Count One.

cause, a retaliatory arrest claim fails. *See Nieves v. Bartlett*, 587 U.S. 391, 404 (2019). Probable cause speaks to the "objective reasonableness" of an arrest. *Id.* at 402. But even where a plaintiff establishes an absence of probable cause, the plaintiff still must show that the retaliation was a "substantial or motivating factor" behind the arrest. *Id.* at 404. A defendant can still prevail by demonstrating that the arrest would have been initiated without respect to retaliation. *Id.*

In *Nieves*, the Supreme Court recognized a "narrow qualification" in circumstances where officers have probable cause to make arrests "but typically exercise their discretion not to do so." *Id.* at 406. *Nieves* used the example of jaywalking, which happens often, but rarely results in arrest. *Id.* at 407. Plaintiff has the burden to produce objective evidence that the arrest occurred in those kinds of circumstances. *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024). If this narrow exception applies, a plaintiff's case can proceed in spite of probable cause, but the plaintiff must still go on to show that the retaliation was a substantial or motivating factor of the arrest (and a defendant may demonstrate that the arrest would have been initiated without respect to retaliation). *Nieves*, 587 U.S. at 407–08.

### A. Officer Baisch Had Probable Cause for Plaintiff's Arrest and the *Nieves* Exception Does Not Apply.

As described in detail above, Officer Baisch had probable cause for Plaintiff's arrest. This is not the kind of case where officers typically exercise their discretion not to arrest. The City of Yuma—and Officer Baisch—routinely make arrests for violations of City Code § 111-04 and for resisting arrest. *Nieves* itself involved an arrest for disorderly conduct and resisting arrest, and the Court did not apply or analyze the exception there. 587 U.S. at 394, 408 ("In any event, Bartlett's claim against both officers cannot succeed because they had probable cause to arrest him."). There is *no* evidence that this is the sort of case where the *Nieves* exception applies and, absent such evidence, summary judgment is proper on Plaintiff's First Amendment claims because Officer Baisch had probable cause to arrest him.

### B. There Is No Evidence That Plaintiff's Speech Was A Substantial Or Motivating Factor Of The Arrest.

But even if Plaintiff could prove an absence of probable cause or the application of the

*Nieves* exception, his claim would still fail because the arrest was not a substantial or motivating factor of the arrest. *See Nieves*, 587 U.S. at 404. Retaliation is not a substantial or motivating factor where an arrest was "anything other than the unintended consequence of an otherwise constitutional police action that was already in progress." *Cervantes v. San Diego Police Chief Shelley Zimmerman,* No. 17-CV-01230-BAS-AHG, 2020 WL 5759752, at *8 (S.D. Cal. Sept. 28, 2020), *aff'd sub nom. Ramirez v. Zimmerman,* 2021 WL 5104371 (9th Cir. Nov. 3, 2021). The First Amendment does not confer the right to remain in an area in spite of a lawful order. *Id.*

Retaliation was not a factor in the arrest, let alone a substantial or motivating factor. There is no evidence Officer Baisch arrested Plaintiff because he was filming. On the contrary, Officer Baisch testified that he arrested Plaintiff because he was too close to the on-going arrest and refused to obey his commands, which posed a safety problem for everyone involved. This was especially so because the incident occurred so close to a major thoroughfare. There is no evidence that Plaintiff's arrest was related to filming rather than his own actions refusing to obey commands.

The only other evidence in the record demonstrates that Plaintiff's activity was not a substantial or motivating factor. Officer Baisch did not arrest Heap, even though she was also present, filming, and asking questions. Heap stayed far enough away that she did not interfere with the arrest, and she complied with officer commands every time that she was asked to back up. Neither Plaintiff nor Heap was ever told or asked to stop filming. Officer Baisch placed Plaintiff's phone safely on the ground when Plaintiff requested that he do so. Additionally, Officer Baisch has never before arrested anyone who was filming.

There is no evidence that retaliation was a factor for the arrest, and that is another reason summary judgment is proper on Plaintiff's First Amendment claims.

### C. <u>Officer Baisch Would Have Arrested Plaintiff Without Respect To Retaliation.</u>

Summary judgment is also proper because Officer Baisch would have arrested Plaintiff without respect to retaliation. As stated above, Plaintiff was refusing to comply with the Officers' commands and was creating a dangerous situation for everyone involved. A reasonable officer would have believed that was a reason to arrest Plaintiff for all of the reasons

described above.

### D. **Retaliation Was Not A Substantial Or Motivating Factor Behind Officer Baisch's Use of Minimal Force.**

To the extent that the Court construes Count 1 as also alleging that the use of force was retaliatory,[4] that claim also fails because Plaintiff cannot show that retaliation was a substantial or motivating factor in the use of force. Plaintiff was hindering an arrest (and had been doing so even before Officer Baisch arrived), refused to comply with verbal warnings, and then, once Officer Baisch used minimal force in moving Plaintiff back, Plaintiff physically resisted by holding onto the fence. Plaintiff remained undeterred and ignored Officer Baisch's commands telling him to stay once he had put Plaintiff on the ground. Plaintiff stood up and moved directly towards Officer Baisch from behind, which posed a threat to Officer Baisch, especially in light of his repeated failures to heed officer commands or force. Officer Baisch then arrested Plaintiff and put him into handcuffs, using only as much force as necessary to effectuate the arrest while Plaintiff resisted.

And, as with the arrest, the record lacks evidence that these actions were motivated by anything other than Plaintiff's own actions in refusing to comply with the Officers' commands. But even if there was such evidence, Officer Baisch still would have used the force because Plaintiff's refusal to listen to his and Officer Kinnell's repeated commands required Officer Baisch to escalate his response. Summary judgment is proper.

## IV. **OFFICER BAISCH IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S EXCESSIVE FORCE CLAIM.**

Courts analyze Fourth Amendment claims of excessive force under an objective reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007). The Court must determine

---

[4] The United States Supreme Court has never recognized such a claim and has not provided a similar framework as in *Nieves*. The Ninth Circuit appears to recognize such a claim even after *Nieves*, *see, e.g.*, *Sanderlin v. Dwyer*, 116 F.4th 905, 911 (9th Cir. 2024), but at least one other circuit has explained the absence of caselaw regarding retaliatory use of force under the First Amendment. *See Hoskins v. Withers*, 92 F.4th 1279, 1294 & n.12 (10th Cir. 2024) (noting that *one* circuit had recognized a First Amendment retaliatory use of force claim at the time of the incident). Defendants disagree with the Ninth Circuit's discussion in *Sanderlin*. The Tenth Circuit in *Hoskins* correctly found that officers should be entitled to qualified immunity on these claims because no case law recognizes them. Nevertheless, Plaintiff's claim fails on its merits.

whether an officer's conduct was objectively reasonable based on the totality of the circumstances by balancing the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests. *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (*citing Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The Ninth Circuit has set forth a three-step test to determine objective reasonableness:

> First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion. Ultimately, we must balance the force that was used by the officers against the need for such force to determine whether the force used was greater than is reasonable under the circumstances.

*Id.* (cleaned up). Officers "are not required to use the least intrusive degree of force possible." *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). Courts also "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in Graham." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) (cleaned up).

In addition, the Supreme Court has warned that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396−97. This Court has recognized that "the 'most important' factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others." *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (cleaned up).

Plaintiff alleged three uses of force were excessive: (1) the backwards escort, [Doc. 1 ¶ 143,] (2) lowering Plaintiff to the ground, [*id.* ¶ 145,] and (3) taking him down to the pavement during his arrest, [*id.* ¶ 148.] Defendants address each of these uses of force below.

## A. **The Backwards Escort Was A Minimal Use Of Force And Was Objectively Reasonable Under The Circumstances.**

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (cleaned up). Summary judgment is proper in cases involving only a minimal or de minimis use of force. *See, e.g.*, *Tuttelman v. City of San Jose*, 420 F. App'x 758, 763 (9th Cir. 2011) (finding an officer's use of force in grabbing a plaintiff's wrist was de minimis and holding that such "de minimis use of force cannot ground an excessive force claim under the Fourth Amendment"). That is especially true where a plaintiff does not suffer injuries or "subsequent trauma." *Henson v. City of Scottsdale*, 2017 WL 3315207, at *6 (D. Ariz. Aug. 3, 2017) ("Without more, a de minimis use of force such as the use alleged under the circumstances does not state a plausible claim for relief under the Fourth Amendment."); *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) ("none of the plaintiffs suffered injuries from defendants' blows that required medical treatment or kept him from returning to the protest. Thus, we conclude that, even if the force used was of a type that is generally intrusive, the amount of force applied here was minimal"). And where an officer has attempted to use verbal commands to no avail, an officer is entitled to use some degree of physical force. *Stickney v. City of Phoenix*, No. CV2001401PHXSMBDCB, 2023 WL 2976943, at *16 (D. Ariz. Mar. 17, 2023) ("Because Casey had either ignored or refused to comply with Arnold's verbal commands, a reasonable officer confronted with these facts could have inferred that any additional warnings or attempts to reason with Casey would also be ineffective and that some degree of physical force was required to get him to comply.")

Here, the Court can and should determine that the use of force was minimal. Cases that analyze the use of this kind of force do not even go on to analyze the *Graham* factors, because the nature of the intrusion is so low that it is justified under even a low governmental interest. The backwards escort is one of the lowest levels of force an officer can employ after verbal commands.

Nevertheless, the government's interest in using the force was high and outweighed the nature of the intrusion. Plaintiff had already refused multiple verbal commands to move away from the in-progress arrest (itself a crime, as discussed above), which was dangerous and

posed a threat for the Officers who were trying to arrest the suspect, the public, and Plaintiff himself. Officer Baisch could not safely assist the other Officers because of Plaintiff's position. The incident took place on a major roadway, and Officer Baisch was concerned about the potential that it could spill out onto the street. Officer Kinnell had initially radioed that he was surrounded—and he still was, by the time that Officer Baisch arrived on scene. Officer Kinnell had tried to tell Plaintiff to move away without success. *See also Stickney*, 2023 WL 2976943, at *16 (officer entitled to use force after arriving when other officers had already attempted less intrusive means). Plaintiff's actions demonstrated that no additional verbal warnings or attempts would get him to move. On balance, the government's interest in moving Plaintiff away from the arrest in progress (with a suspect who was physically resisting arrest), more than outweighed the de minimis nature of the intrusion in moving Plaintiff back and away from the Officers, who were all engaged with the suspect and could not have gotten involved in the interaction with Officer Baisch and Plaintiff. Summary judgment is proper on Plaintiff's excessive force claim based on Officer Baisch escorting him backwards.

### B. Officer Baisch Used Minimal Force Lowering Plaintiff To The Ground, Which Was Objectively Reasonable Under The Circumstances.

Courts in this Circuit have consistently held that even a control hold and subsequent wrist lock takedown is a minimal use of force. *Donovan v. Phillips*, 685 F. App'x 611, 612–13 (9th Cir. 2017) (use of force "relatively minimal" where officer grabbed plaintiff's wrist, pulled her arm downward, and caused her to roll on the ground); *Wheatcroft v. City of Glendale*, 2022 WL 879066, at *5 (D. Ariz. Feb. 22, 2022) (citing *Donovan* and concluding "[t]he arm bar, a type of control hold, is a minimal use of force."), *on reconsideration in part*, 2022 WL 1128941 (D. Ariz. Apr. 15, 2022), *and appeal dismissed sub nom. Wheatcroft v. Fernandez*, 2022 WL 2255721 (9th Cir. Apr. 21, 2022); *M.M. v. County of San Mateo*, 2020 WL 109229, at *7 (N.D. Cal. Jan. 9, 2020) ("Generally, cases analyzing similar interactions involving control holds or pain compliance techniques have classified the nature and quality of the intrusion to be 'minimal.'") *aff'd,* 843 F. App'x 954 (9th Cir. 2021).

Here, Officer Baisch's use of force was minimal at best. His action did not even rise to the level of a control hold or use of pain compliance techniques. He did not use a wrist-lock

takedown to move Plaintiff to the ground. Officer Baisch put his hand on Plaintiff's head to lower him to the ground. That is less force than the wrist-lock takedown described in *Donovan* or *Wheatcroft*. Additionally, Plaintiff testified that he did not sustain any injuries until he was put on the ground the *second* time and, thus, he did not sustain any injuries during this use of force. Again, courts have recognized that a use of force is minimal where a plaintiff does not sustain any injuries.

As above, this Court can stop its analysis with the fact that the use of force was de minimis. But even a minimal use of force would be objectively reasonable under the totality of the circumstances. In addition to the circumstances that justified the initial backwards escort, Plaintiff resisted the backwards escort by grabbing onto the fence and using his bodyweight to physically resist arrest. He had, at this point, shown that neither verbal commands nor a lower level of force would stop him from interfering with the arrest of the suspect. That constituted *additional* crimes under Arizona law and heightened the risk from Plaintiff's resistance as he demonstrated that he was willing to use physical force (holding onto the fence and pushing against Officer Baisch) to stop officers from moving him away, which also constituted an assault under Arizona law. On balance, the government's interest in moving Plaintiff away from the situation after he had shown physical resistance to officers' commands far outweighed the minimal nature of the force. Summary judgment is proper on Plaintiff's excessive force claim based on Officer Baisch lowering him to the ground.

**C. <u>Officer Baisch's Takedown Was Objectively Reasonable Under The Circumstances.</u>**

A takedown maneuver is a minimal to intermediate deployment of force and is routinely found appropriate where a suspect is refusing lawful commands and is threatening the officer or community at large. *See, e.g.*, *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021). A takedown that is somewhat uncoordinated may be a slightly higher use of force but is still considered a "modest to intermediate" use of force. *Stickney*, 2023 WL 2976943, at *17. Other courts, however, have referred to a takedown from grabbing someone's arm as "relatively minimal." *Donovan*, 685 F. App'x at 612–13. The Ninth Circuit has held that the use of wrist lock techniques do not constitute an unreasonable use of force to obtain control over

a suspect and do not pose a significant risk of injury. *See Fuller v. County of Orange*, 276 F. App'x 675, 680 (9th Cir. 2008) ("Fuller was uncooperative, intoxicated, and resisted the deputies in conducting the search, which required the deputies to place Fuller in a rear wristlock. . . . Under these circumstances, placing Fuller in a rear wristlock did not constitute an unreasonable use of force.").

Here, Officer Baisch was attempting to get Plaintiff to give up his arm to try and get him into handcuffs.[5] During the struggle, Plaintiff ended up on the ground, which could be viewed as the relatively minimal force in *Donovan*. On the body-worn camera, he can be seen trying to stand up even after he ends up on the ground. Moreover, the injuries Plaintiff sustained (scrapes and cuts) were minimal, which also suggests that the force was minimal.

But even if this court saw the force as moderate or intermediate, the government interests outweigh the intrusion such that the use of force was reasonable under the totality of the circumstances. Plaintiff had refused multiple officer commands until this point, which constituted crimes under Arizona law. Officer Baisch had told him to stay after he was on the ground the first time, but Plaintiff stood and moved towards Officer Baisch. A person who walks up behind an officer, after being ordered to stand back, poses a greater threat to the officer, especially after use of the (low level) of force failed. Plaintiff's failure to comply justified an escalation of force—here, trying to get Plaintiff into handcuffs. Plaintiff still did not comply or give up his arms when Officer Baisch told him he was under arrest and Officer Baisch used only the amount of force necessary to get Plaintiff into handcuffs. In the ensuing struggle, Plaintiff again ended up on the ground.[6] He even tried to stand up multiple times as

---

[5] Plaintiff's Complaint does not appear to treat the handcuffing as a separate use of force. Courts routinely find that use of force in handcuffing is reasonable. *Yaroshinsky v. City of Los Angeles*, 21-56173, 2022 WL 17248095, at *1 (9th Cir. Nov. 28, 2022) (noting that handcuffing producing a rotator cuff disorder was a "minimal" use of force); *LaLonde v. County of Riverside*, 204 F.3d 947, 964 (9th Cir. 2000) (Trott, J., concurring and dissenting in part) (Although "[h]andcuffs are uncomfortable and unpleasant," they are a "standard practice, everywhere."); *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1006 (D. Ariz. 2012) ("Defendants had probable cause to arrest David, and handcuffing is a regular procedure during an arrest. There is no material issue of fact as to whether the handcuffing was itself legitimate, and no allegation that the handcuffing was conducted in a manner that constituted excessive force.")

[6] That distinguishes this use of force from a takedown where, for example, an officer uses a leg sweep, tackle, or other body movement to force the person to the ground. The cases

Officer Baisch was trying to keep him on the ground while handcuffing him. On balance, Officer Baisch's use of force was objectively reasonable under the totality of the circumstances. Summary judgment is proper on Plaintiff's excessive force claim as premised on the takedown.

## V. SUMMARY JUDGMENT IS PROPER ON THE *MONELL* CLAIMS.[7]

### A. Plaintiff's *Monell* Claims Fail Because There Is No Evidence of An Underlying Constitutional Violation.

A municipality cannot be held liable as a matter of law under § 1983 in the absence of an underlying constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Summary judgment is proper here because, as described above, Plaintiff cannot establish a constitutional violation.

### B. The Record Lacks Evidence of An Unconstitutional Policy.

Ordinarily, a single constitutional deprivation "is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985). Thus, to establish that the City is liable under § 1983, Plaintiff must prove: (1) that he possessed a constitutional right of which he was deprived; (2) that the City had a policy; (3) that this policy amounts to deliberate indifference to the constitutional right; and (4) that the policy is the moving force behind the constitutional violation. *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). A city cannot be held liable under § 1983 under a doctrine of respondeat superior. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Plaintiff alleged that the City of Yuma failed to provide proper training and supervision and lacked policies regarding filming and de-escalation. [Doc. 1 ¶¶ 126–29, 178–81.] Plaintiff also alleged that the City is liable in respondeat superior, [*id.* ¶ 124,] but that claim necessarily fails on its merits.

#### 1. The City maintained use for force and First Amendment policies.

To prevail, Plaintiff must prove that the alleged constitutional violations were

---

cited above, however, demonstrate that even those kinds of actions—which involve a move physical force against a person—would be reasonable under the circumstances.

[7] Claim Three pertains to the First Amendment Claims and Claim Seven pertains to the Fourth Amendment Claims.

committed pursuant to a formal governmental policy, or a longstanding practice or custom which is the City's standard operating procedure. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). A single instance of conduct is not enough to put the city on notice, instead, Plaintiff would have to show that the City's policies evidence a "deliberate indifference" to the constitutional rights at issue. *See Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 960 (9th Cir. 2010). He would have to show that the City "was on actual or constructive notice that its omission would likely result in a constitutional violation" and "that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (citation omitted).

Plaintiff has not alleged that the City had a formal policy that caused the alleged constitutional violations, and the record lacks evidence to show that the City's policies were deficient. Instead, he alleged that the City did not have *any* policies in place. That is contrary to the record. The City maintained policies on use of force, had a policy regarding the media, and directives on filming that had the same force as policies. The record lacks any evidence that those policies evidence a "deliberate indifference" to the constitutional rights at issue or any evidence that the City had actual or constructive notice that their policies would likely result in a constitutional violation *and* that a different policy could have prevented the violation.

**2. The record lacks evidence of a policy of inadequate training.**

To establish a "policy" of inadequate training, Plaintiff must offer evidence that the City's training was deliberatively indifferent to the rights of its citizens. *City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (cleaned up). After all, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). In addition, Plaintiff must identify the specific deficiency in the City's training or supervision and establish that the deficiency directly caused the constitutional deprivation. *See City of Canton*, 489 U.S. at 385–86.

Plaintiffs must also show the City made a "conscious" or "deliberate" policy decision knowing this incident would likely result. *Id.* at 389. Thus, municipal liability "is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. Simply put, the City cannot be held liable absent sufficient evidence of a "program-wide inadequacy in training." *Blankenhorn v. City of Orange*, 485 F.3d 463, 484–85 (9th Cir. 2007).

Here, Plaintiff's *Monell* training claim fails because the record lacks evidence of any pattern of deficient training to put the City on notice that its training and policies regarding filming or use of force. *See Flores*, 758 F.3d at 1159. The City maintained a media policy as well as a directive regarding First Amendment activities, which Officer Baisch acknowledged when it was promulgated. Those directives had the same force as policy in the City. The City also maintains robust policies on use of force, including explaining when and if an Officer should de-escalate a situation. The record lacks *any* evidence of similar incidents that would have put the City on notice of these issues.

Additionally, the record demonstrates that Officer Baisch completed all training requirements for AZPOST certification. *See Krakauer v. Flagstaff, City of*, 2022 WL 4118663, at *21 (D. Ariz. June 6, 2022) ("Defendants have also shown that both Defendant Officers were AZPOST certified, meaning they had received mandatory police officer training in the proper of force; both officers had completed additional trainings on FPD policies more than once a year, including on the proper use of force; and neither officer had ever been disciplined for improper use of force or false arrest. These facts demonstrate that the City did not have an official policy or custom of failing to train or supervise its police officers."); *Hillbloom v. County of Fresno*, 2010 WL 4481770, at *11, 34 (E.D. Cal. Nov. 1, 2010) (summary judgment proper on claim where training exceeded POST requirements); *see also Ward v. Still*, 2012 WL 37518, at *13–14 (E.D. Tenn. 2012) ("If . . . police officers were certified by the POST Commission, then the issue of the adequacy *vel non* of their training is resolved."); *see also Mendez v. County of San Bernardino*, 540 F.3d 1109, 1123 (9th Cir. 2008) (affirming summary judgment under state-law negligent training claim in part because county training conformed with POST regulations), *overruled on other grounds*, *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014).

In addition to the POST training, the City of Yuma conducts its own training covering these topics. The City of Yuma's training is *eight times* that of AZPOST. Indeed, Plaintiff's *own expert* conceded that Officer Baisch's training exceeded the minimum standards in Arizona and other states.

There is no evidence of a pattern of deficient training. Summary judgment is proper on Plaintiff's *Monell* claim based on training.

**3. The record lacks evidence of a policy of inadequate supervision.**

"Usually, a failure to supervise gives rise to section 1983 liability only in those situations in which there is a history of widespread abuse." *Bowen v. Watkins*, 669 F.2d 979, 988 (5th Cir. 1982) (emphasis added); *see also Santos ex rel. Santos v. City of Culver City*, 228 Fed. App'x. 655, 659 (9th Cir. 2007) (affirming the district court's grant of summary judgment on a *Monell* claim under the "moving force" prong because there was no evidence of a causal link between city's policies and the officer's actions). Defendants are unaware of any authority requiring officers to continuously operate under an acting supervisor at every second while on duty. Moreover, even if such supervision were required, any such failure would only amount a single incident of officer misbehavior, which cannot establish *Monell* liability as a matter of law. *See McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000); *Vasquez v. City of Santa Paula*, 2015 WL 12734071, 2015 WL 12734071, at *3–4 (C.D. Cal. Mar. 11, 2015).

The record lacks any evidence of a history of widespread abuse such that the City would be on notice that it needed additional supervision. Officer Baisch had never been disciplined for related uses of force or for arresting someone in violation of their First Amendment rights. Summary judgment is appropriate on Plaintiff's *Monell* claim regarding supervision.

**C. <u>There Is No Evidence Of Ratification.</u>**

To the extent that Plaintiff's Complaint could be construed as including a claim based on ratification, Plaintiff must show that an authorized final policymaker approved both a subordinate's decision and the basis for it. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). This requires a showing that the decision triggering § 1983 liability "was the product of a conscious, affirmative choice to ratify the [unconstitutional] conduct in question." *Haugen*

*v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003) (cleaned up), *rev'd on other grounds, Brosseau v. Haugen,* 543 U.S. 194 (2004). In addition, the Ninth Circuit has held that merely failing to discipline individual officers accused of unconstitutional conduct does not amount to ratification. *Id.* at 393. Rather, Plaintiffs must show the City made a deliberate choice to endorse the officers' (unconstitutional) actions and the bases for them as its own policy. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992).

The record lacks evidence that the City ratified Officer Baisch's allegedly unconstitutional conduct. *See Esquivel v. City of Yuma*, 2016 WL 1719954, at *6 (D. Ariz. Apr. 29, 2016) ("The only basis Plaintiff provides for imposing liability on the City of Yuma is that the Police Chief ratified Officer Carrillo's allegedly unconstitutional conduct by reviewing information about the March 1, 2014 incident and doing nothing more.") Plaintiff alleges that Chief Garrity "endorsed" (rather than officially ratified) Officer Baisch's conduct during a media interview when he stated did not find fault with Officer Baisch's actions. [*see* Doc. 1 ¶ 134, 183.] Chief Garrity's media statement, however, is insufficient to show that he made a conscious, affirmative choice to approve unconstitutional conduct and adopt it as policy. There must be something more. *See Brawley v. Punt*, 186 F. Supp. 3d 1102, 1116 (D. Mont. 2016) (finding Chief's statement at the Coroner's Inquest that he "believe[d] that Officer Punt's use of deadly force . . . was justified, it was within [the City's] policy and guidelines" was insufficient to establish an adoption of an unconstitutional policy). Finally, there is no evidence of a constitutional violation or any such ratification. *Id.* at 1116 ("There is no evidence of a causal connection between Chief St. John's acceptance of the investigation and conclusion and the alleged violation of Brawley's constitutional rights."); *Oakry v. Tempe, City of*, 2022 WL 137621, at *4–5 (D. Ariz. Jan. 14, 2022) (the record must contain "something more" that shows statements regarding an incident are adopted as official policy, such as ratification through departmental training).

***

The record lacks evidence that the City had a practice, policy, or custom that caused a deprivation of Plaintiff's constitutional rights. Summary judgment is therefore proper.

## VI. OFFICER BAISCH IS ENTITLED TO QUALIFIED IMMUNITY.

The defense of qualified immunity requires judgment in favor of a government employee unless the employee's conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The defense is designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The law is clearly defined where "an officer taking similar actions in similar circumstances was held to have violated the Constitution." *Zorn v. Linton*, 607 U.S. __. No. 25–297, 2026 WL 795469, at *3 (U.S. Mar. 23, 2026) (cleaned up). Under controlling Supreme Court precedent, clearly established law may not be defined "at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12–13 (2021). Existing precedent must place the question "beyond debate." *Zorn*, 2026 WL 795469, at *3. Plaintiffs have the burden to identify a case that puts officers on notice that their specific conduct was unlawful. *Rivas-Villegas v. Cortesluna,* 595 U.S. 1, 6 (2021).

Officer Baisch is entitled to qualified immunity on the first prong of qualified immunity because, as described above, Plaintiff cannot establish that he violated his constitutional rights. Officer Baisch is also entitled to qualified immunity on the second prong of qualified immunity because Plaintiff cannot identify a case that put Officer Baisch on notice that his specific conduct was unlawful and would violate Plaintiff's rights. Officer Baisch does not have the burden to demonstrate that a case shows that his actions were lawful. Nevertheless, case law demonstrates that officers have acted reasonably in similar circumstances, as described above.

Officers are entitled to qualified immunity even in cases where they did not have probable cause as long as they had arguable probable cause—that is, as long as a reasonable officer would have believed there was probable cause for an arrest. *See Reed v. Lieurance,* 863 F.3d 1196, 1204–05 (9th Cir. 2017) ("[I]f an officer makes an arrest without probable cause, he or she may be entitled to qualified immunity as long as it is reasonably arguable that there was probable cause for the arrest.").

The Ninth Circuit has also acknowledged that qualified immunity is proper in First Amendment cases where officers "could disagree as to the legality of these arrests." *See, e.g.*,

*Bidwell v. County of San Diego*, 2023 WL 7381462, at *2 (9th Cir. Nov. 8, 2023); *see also Sanderlin v. Dwyer*, 2024 WL 4039752, at *2 (9th Cir. Sept. 4, 2024) (granting qualified immunity in case where officer orders others to take actions to enforce a dispersal order); *DeCastro v. Las Vegas Metro. Police Dep't*, 2024 WL 4189939, at *11 (D. Nev. Sept. 12, 2024) ("DeCastro has not identified a Supreme Court or Ninth Circuit case establishing that a bystander has a right to film from a particular distance, that an officer cannot tell a bystander filming a traffic stop that they must back up, how far the officer can order the person to back up, and that the officer cannot arrest a person who disobeys that directive.").

In the context of excessive force claims, the Ninth Circuit has also recognized that an officer does not violate any clearly established right "when he progressively increases his use of force from verbal commands to an arm grab, and then a leg sweep maneuver, when a misdemeanant refuses to comply with the officer's orders . . . in a challenging environment." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). And the United States Supreme Court recently held that the right was not clearly established where an officer placed pressure on a peaceful protestor's wrist to remove her from a legislative chamber. *Zorn*, 2026 WL 795469, at *2–3.

Given the backdrop of these cases, and those cited above supporting the lack of constitutional violation in this case, Plaintiff cannot meet his burden to produce a case that clearly establishes that Officer Baisch's conduct was unreasonable, and summary judgment is proper on Plaintiff's claims against Officer Baisch.

## VII. PLAINTIFF IS NOT ENTITLED TO PUNITIVE DAMAGES.

Punitive damages are unavailable against Officer Baisch because Plaintiff's § 1983 claims fail for the reasons explained above. Moreover, the record is devoid of any evidence that Officer Baisch acted with an "evil motive" or "callous indifference" to warrant punitive damages under § 1983. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

## VIII. CONCLUSION.

Based on the foregoing, Defendants City of Yuma and Officer James Baisch respectfully request that this Court grant them summary judgment on Plaintiff's claims.

DATED this 27th day of March, 2026.

JONES, SKELTON & HOCHULI, P.L.C.

By */s/ Michele Molinario*
Michele Molinario
Derek R. Graffious
Ashley E. Caballero-Daltrey
Melynda M. Meyrick
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Attorneys for Defendants City of Yuma and James Baisch

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March, 2026, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

Gregg P. Leslie, Esq.
ASU Sandra Day O'Connor College of Law
First Amendment Clinic, Public Interest Law Firm
111 E. Taylor Street, Mail Code 8820
Phoenix, AZ 85004
Gregg.Leslie@asu.edu
*Attorney for Plaintiff Lucas Mullikin*

*/s/ Crystal Wong*